Elizabeth J. HARMON, Appellant,

v.

Julia Margaret HARMON, Appellee.

No. 46665.

Court of Appeals of Oklahoma,
Division No. 2.

Sept. 10, 1974.

Rehearing Denied Oct. 4, 1974.

Released for Publication by Order of the
Court of Appeals, Oct. 24, 1974.

John H. Kennedy, Oklahoma City, for appellant.

John Chiaf, Chiaf & Murphy, Oklahoma City, for appellee.

BRIGHTMIRE, Presiding Judge.

The parties are two women who vied for the affections of the late Obie E. Harmon. Elizabeth, who was married to him for nearly 28 years seeks damages from Margaret whose "wiles and blandishments" she says enticed Obie from his former home and caused his affections for her to wane. In advance of trial the court granted defendant a summary judgment on the ground that the record disclosed uncontrovertibly that Elizabeth's action is barred by the statute of limitations. Hence the only question is is it?

The recorded circumstances are rather bizarre. Elizabeth married Obie in 1942 and bore him five children.

"We have argued and fussed ever since we were married and the past two years it got worse," was the way Obie, a fireman, described his long association with Elizabeth while testifying in January 1970, "I work under tension . . . and when I come home why its a fuss and a fight every day. I came up with ulcers in 1968. . . . Some nights I would be home in bed asleep and she would flip the lights on and tell me to get out of bed and argue and fuss and fight."

Being something less than marital bliss, the domestic incompatibility he stoically endured, Obie said, until June 1969 when one night Elizabeth "told me to get my clothes and get." He did. Later, however, "she called me up at work and wanted me to come back." And he did.

The couple took a thirty-day vacation and toured California. They returned home late in July. A few evenings later about eleven o'clock Obie said of Elizabeth: "She threw all my guns out, my clothes and told me to get out. . . . She gathered up the things and threw them all out the front—down the steps out front . . . I gathered them up . . . put them in my car and left."

At time of the divorce trial, Obie testified he never returned. This was on January 27, 1970—the day he was granted a divorce.

Obie married Margaret, the defendant, on July 30, 1970. Just how this marriage progressed is not recorded. Elizabeth does mention in the petition she filed on October 20, 1971, to start this case, however,

that "while Obie E. Harmon was in the home of defendant's parents near Mount Olive, Arkansas, on September 4, 1971, he was fatally shot by the wife of the defendant's brother." And to deepen the mystery Margaret alleged in her answer that on this same day 'her "mother, father, husband, brother and sister-in-law were killed"—a tragedy which Margaret thought prompted Elizabeth to bring this action upon learning her source of alimony was dead.

Margaret also alleged the belated action was barred by the statute of limitations. On March 28, 1973, defendant moved for a summary judgment stating "no material fact or controversy" about the fact the two-year statute of limitations ran prior to the institution of this action because: (1) Elizabeth "threw" Obie out on July 29, 1969, and they never effected a reconciliation thereafter; (2) Obie filed suit for a divorce on October 1, 1969; (3) Obie died on September 4, 1971; (4) this action founded as it .is on Margaret alienating Obie's affection for Elizabeth, was not filed until October 20, 1971—less than two months after Obie's death but almost three months after the "Statute of Limitations . . . expired on July 28, 1971."

Elizabeth of course took issue with the last mentioned date and by affidavit contended that the two-year statutory period did not begin to run until January 27, 1970. She swore she remained married to Obie "until a divorce was granted January 27, 1970. . . . We did not finally separate and end our marriage until the date of the divorce. We constantly discussed a reconciliation, and did not consider the marriage ended. During the period . . . July 29, 1969, until November 3, 1969, I was with Obie Harmon repeatedly, eating together, visiting together, and we last had sexual relations on November 3, 1969."

The ultimate question then is this—when did the statute of limitations begin to run with regard to plaintiff's allegations of alienation of affections and criminal conversation against defendant?

■ To solve this problem a good point of departure is from this controlling statutory excerpt from 12 O.S.1971, § 95: "Civil actions . . . can only be brought within the following periods, *after the cause of action shall have accrued. . . .* " (emphasis ours) And when does a cause of action accrue? Generally at the moment the party owning it has a legal right to sue. Overton v. Overton, 121 Okl. 1, 246 P. 1095 (1926).

The pivotal question therefore is on what date did plaintiff first have a legal right to bring this action? It is a question easier to ask than answer mainly because the tort involves not merely some particular wrongful act but the culmination of a variable period of effort on the part of an alienator to influence the psyche of the alienatee the success of which is identifiable only by alienatee's response of eventual disaffection for the former object of his affection. Except perhaps for the "love at first sight" phenomenon, the tort takes a while to commit.

So a fundamental problem becomes evident—one that has caused courts over the country no small amount of difficulty—is an actionable tort committed when (1) the first attempt to alienate affections is made, or (2) when the attempt achieves partial success, or (3) when it achieves complete success?

First one notes that in the area of domestic relations the phrase alienation of affections has been used in this state to describe virtually all tortious third party infringements on the marital rights of a spouse. Thus it includes not merely the loss of a mate's affections but loss of his or her consortium—a broad term referring to the exclusive entitlement of one spouse to the services, society, assistance, conjugal fellowship, and coital cooperation of the other. Red Eagle v. Free, 191 Okl. 385, 130 P.2d 308 (1942); McKee v. McKee, 172 Okl. 35, 43 P.2d 1041 (1935); Overton v. Overton, supra; Brown v. Brown, 104 Okl. 206, 230 P. 853 (1924). Criminal conversation—adulterous defilement of the marriage bed—consequently is also encom-

passed by subject phrase, it being a violation of the last mentioned marital right. Being more identifiable as a particular tortious act the offence ordinarily presents less difficulty in applying the limitations statute—that is if it can be proved.

·[2–4] The first moment of plaintiff's right to sue arrives when there is an actual infringement of plaintiff's right accompanied by consequential detriment. Until damage has been sustained no actionable cause does he or she possess. For the lack of detriment then an unsuccessful attempt to alienate one's spouse's affections does not start the limitation running. And since the law contemplates a complete loss of affection in regard to the tort under consideration it follows that an attempt to alienate a spouse's affection which is only partially successful is inactionable for lack of legal detriment.

But suppose one element—for example a single act of criminal conversation—is accomplished followed by six months of psychological effort before a loss of consortium is sustained by the jilted spouse? Does the latter have two years from the date of the first act or two years from total loss of consortium?

We think the fair way to solve this problem is to consider such a situation as an identifiable single occurrence and to hold that the statute of limitations does not begin to run until the goal of the contiguous series is reached. Distinguishable are isolated instances of malfeasance unconsummated by estrangement and unrelated to a long-range scheme designed to disrupt a spouse's domestic tranquillity.

■ This seems to be the underlying reasoning of *Overton*. There, in dealing with facts remarkably similar to the ones here, the record disclosed that plaintiff Ann became aware Overton's (her then husband) association with defendant Ellen as early as November 4, 1921, on which date Ann offered Ellen a chance to stop rendezvousing with Overton at various apartments in town. Ellen rejected the offer and came back with a counteroffer to kill Ann. Through it all Overton continued to live at Ann's home until she filed a divorce action on November 16, 1922. Overton returned to Ann's home for a visit on Christmas day 1922 and discussed dismissal of her divorce action offering, if she would dismiss, to give up Ellen. Ann turned the offer down and a divorce was granted her April 27, 1923. Overton married Ellen the following November and "departed this life May 19, 1924." Ann then brought an alienation of affections suit against Ellen November 15, 1924. In holding the action was not barred by limitations the court said regarding Ellen's wrongful acts prior to Overton's permanent move from Ann's home: "It is the latent wrong theretofore committed which evidenced itself at the date of the complete loss for which plaintiff seeks her remedy and not for continuing wrongful acts thereafter. When the wrong was evidenced by the loss, the cause of action was complete, the statute of limitations began to run . . . ." In other words, as we understand *Overton*, it is not the wrongful acts themselves that start the limitation running but the occurrence of consequential "loss of the spouse's physical presence [as a resident] in the home [that] is the climax as to time from whence the statute of limitations runs." This act of separation is chosen as the accrual date because it is the first significant objective sign that defendant's wrongful orchestration has achieved demonstrative success.

The same rationale dominated Brown v. Brown, supra. Citing plaintiff's abandonment by her husband as crucial in determining when the statute of limitations began to run against an alienation of affections suit the court said: "An action for damages for criminal conversation or alienating the affections of the spouse is not barred from the time of the commencement of the acquaintanceship or the practicing of the wiles and blandishments inducing the spouse to the abandonment but is a continuous one."

In the case at bar Elizabeth alleged Margaret alienated Obie's affections between May 1969 and January 27, 1970, the date on which he "permanently left the home of the parties." Thus on its face the petition pleads an unbarred cause of action. But in a deposition Elizabeth swore to these facts:

"Well, let me ask you something else, ma'am with reference to the last time that you and he [Obie] finally separated," said the examiner to Elizabeth.

"Yes, sir," she said.

"Wasn't that the time that you threw his stuff out of the house?"

"Yes, sir," Elizabeth answered.

"That was in July of '69, July 29?"

"29"

A little later plaintiff was asked, "All right, you didn't go back together after that, did you?"

"To live together?" Elizabeth asked.

"Yeah."

"No, sir."

Moreover she admitted that following the July 29 separation "we never did make a reconciliation."

From these admissions the conclusion is inescapable that the "latent wrong" commenced by defendant in May 1969 culminated in a "complete loss" of any affection Obie may have had for Elizabeth on July 29, 1969, when he departed from her home and never returned to live with her again.

■ The consequence of these undisputed facts therefore is that Elizabeth's cause of action against Margaret accrued as a matter of law on July 29, 1969. It follows that the two-year statute of limitations began to run on that date there appearing no other facts or circumstances to toll it. Because this action was not filed until October 1971 it is barred and summary judgment was properly granted defendant.

Affirmed.

BACON, and NEPTUNE, JJ., concur.